UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

In re: Texas Reds, Inc.,     No. 7-04-15995 JF

       Debtor.

Yvette J. Gonzales,

       Plaintiff,

v.     Adv. No. 09-1132 J

Nancigail Miller, William Gill and
Walter L. Reardon, Jr.,

       Defendants.

## MEMORANDUM OPINION

This matter came before the Court upon three motions for summary judgment: Plaintiff, Yvette Gonzales, Chapter 7 Trustee, filed two Motions for Summary Judgment and briefs in support, one against Defendant Walter L. Reardon, Jr. (Docket Nos. 61 and 62) and the other against Defendant William Gill (Docket Nos. 63 and 64), both filed January 7, 2011. Mr. Reardon filed his Motion for Summary Judgment and brief in support on January 7, 2011. (Docket Nos. 65 and 66)[1].

This adversary proceeding arises from underlying events occurring during the Debtor's Chapter 11 bankruptcy case filed August 16, 2004. The Chapter 11 case converted to a case under Chapter 7 on June 4, 2008. The Chapter 7 Trustee seeks to recover damages for breach of two contracts: one for the sale of the Debtor's assets and the other for rental of restaurant assets

---

[1] On June 9, 2010, Mr. Reardon filed a Motion to Dismiss Adversary Proceeding on Count 1 of the Amended Complaint. Mr. Reardon asserted that the Amended Complaint failed to state a claim against him for breach of contract on the basis the agreements violate the New Mexico Statute of Frauds. On June 27, 2010, the Court entered its Memorandum Opinion (Docket No. 44) and Order Granting, In Part, and Denying, In Part, Defendant Walter Reardon's Motion to Dismiss Count I (Docket No. 45) wherein the Court dismissed the civil conspiracy claim asserted against Walter Reardon and denied the motion to dismiss Plaintiff's breach of contract claim.

and sale of inventory pending consummation of the asset sale.  The Trustee seeks damages against Mr. Gill as the undisclosed principal under each contract, and against his counsel, Mr. Reardon, under agency liability principles.  The Chapter 7 Trustee further seeks to recover an outstanding account allegedly owed by Mr. Gill to the estate, as reflected in monthly operating reports filed during the Chapter 11 Case.  Mr. Reardon seeks summary judgment in his favor, asserting that he is not personally liable under agency liability principals.  Alternatively, Mr. Reardon asserts that under the statute of frauds no enforceable agreement was made for the sale or lease of estate assets, that if an enforceable existed, there was no breach because of a financing contingency in the contract, and that, in any event, damages relating to the sale of estate assets are limited to forfeiture of earnest money.

 The Court heard oral argument on May 17, 2011 and took the matter under advisement.  After consideration of the applicable statutory provisions, case law and arguments of counsel, the Court has determined that 1) the agreement for the purchase of estate assets contained a financing contingency that was not satisfied, and, therefore neither Mr. Gill nor Mr. Reardon are liable for breach of that agreement; 2) both Mr. Gill and Mr. Reardon are liable for the unpaid rent under lease of restaurant assets pending consummation of the asset sale; and 3) outstanding fact issues remain concerning the true character of the amount reflected in the monthly operating report as an account allegedly owed by Mr. Gill to the estate.  The Court will, therefore, grant Mr. Reardon's motion for summary judgment as it relates to the sale of the Debtor's assets, grant the Trustee's motions for summary judgment, in part, as to the claims arising from the rental of restaurant assets and sale of inventory, and deny the Trustee's motion for summary judgment on its claim against Mr. Gill for recovery of the outstanding account.

2

Case 09-01132-j    Doc 86    Filed 09/29/11    Entered 09/29/11 14:31:11 Page 2 of 18

## A. FACTS NOT SUBJECT TO GENUINE DISPUTE

Texas Reds, Inc. ("Texas Reds" or the "Debtor") filed a voluntary petition under Chapter 11 of the Bankruptcy Code on August 16, 2004 (the "Texas Reds Bankruptcy Case"). Texas Reds operated a restaurant in Red River, New Mexico known as the Texas Reds Steakhouse. Mr. William Gill was the president of Texas Reds Inc. and operated the Texas Reds Steakhouse. Richard Parmley was appointed as Chapter 11 Trustee. Walter Reardon was counsel of record for William Gill in the Texas Reds Bankruptcy Case.

During the Chapter 11 phase of the Texas Reds Bankruptcy Case, the Debtor filed monthly operating reports. Robert L. Mantz, CPA, prepared the monthly operating reports on behalf of the Debtor. William Gill signed the monthly operating reports as the responsible party, under penalty of perjury, declaring that he examined the reports, and that the reports are true, correct, and complete to the best of his knowledge. The Monthly Operating Report for September 2005 (the "September 2005 MOR") is thirteen pages, including the cover sheet with the signatures of Mr. Gill and Mr. Mantz. The explanation for Line 13 of the September 2005 MOR (Amounts Due from Insiders) reflects a balance of $98,519.15 owing from Mr. Gill. The first monthly operating report filed in the Texas Reds Bankruptcy Case covered the month ending October 31, 2004 (the "October 2004 MOR"). The October 2004 MOR reflects $73,003.60 owing from Mr. Gill. In preparing the monthly operating reports for the Debtor, Mr. Mantz would fax or mail the report to Mr. Gill, who would sign the report and send it on to counsel for the Debtor to be filed. It was Mr. Mantz's understanding that Mr. Gill reviewed all of the monthly operating reports at the time he signed them.

On or about May 24, 2008 William Gill sent to the Chapter 11 Trustee a letter of intent, signed by his daughter, Ms. Nancigail Miller, dated May 24, 2008 (the "Letter of Intent"). The Letter of Intent stated that it constituted an offer to purchase the assets of the Texas Reds Steakhouse for $50,000 contingent on completion of necessary documents and obtaining financing within 30 days of acceptance. The Letter of Intent further stated that Ms. Miller would be sending $500.00 to the Chapter 11 Trustee as an earnest money deposit. The chapter 11 case converted to a case under Chapter 7 on June 4, 2008 before the Chapter 11 Trustee responded to the offer. Yvette Gonzales was appointed Chapter 7 Trustee.

By a letter dated June 5, 2008 from Mr. Reardon to Yvette Gonzales, Mr. Reardon advised her that she was about to be appointed Chapter 7 trustee in the Texas Reds Bankruptcy Case, and explained that Mr. Gill's daughter, Ms. Miller, had made an offer to the Chapter 11 Trustee to purchase the restaurant equipment and trade name and that he did not know whether the Chapter 11 Trustee would act on the offer before the case converted. Mr. Reardon's letter further states: I would propose a 30 day lease to Nancigail Miller while the sale is pending . . . ."

On June 10, 2008, Mr. Reardon sent email correspondence to counsel for the Chapter 7 Trustee referring to a "lease proposal and offer attached." Attached to the email transmission was the Letter of Intent and a letter from Mr. Reardon to counsel for the Chapter 7 Trustee. In the letter, Mr. Reardon stated that he had forwarded to the to the Chapter 11 Trustee an offer made by Nancigail Miller to purchase assets of the Texas Reds Steakhouse but that the Chapter 11 Trustee never acted on the offer. The letter identifies Ms. Miller as Mr. Gill's daughter, and proposes that Ms. Miller operate the restaurant under a week-to-week lease until the Chapter 7 Trustee rejected the purchase offer or closing of a sale to Ms. Miller. The letter proposed rent of $250 per week, payment of utilities and other expenses of operating the restaurant, valuation of

4

the inventory at $3,000, and that "Ms. Gill" would pay weekly for the amount of inventory actually used.

By an email correspondence to Mr. Reardon dated June 10, 2008, the Chapter 7 Trustee by counsel made a counteroffer to the purchase offer contained in Ms. Miller's Letter of Intent and the proposed week-to-week lease contained in Mr. Reardon's June 10, 2008 letter. Among the terms of the counteroffer were that the Trustee would sell the restaurant assets to Ms. Miller for $50,000, that there be a $5,000 earnest money deposit to be applied to the purchase price on closing, that Ms. Miller lease the restaurant on a week-to-week basis pending closing for $250 per week and that Ms. Miller pay $3,000 for the restaurant inventory and the expenses of operations. The email correspondence ended with a request that Mr. Reardon let counsel for the Chapter 7 Trustee know whether the terms of the counteroffer were acceptable. There is no evidence before the Court of a response by Mr. Reardon or Ms. Miller to the Chapter 7 Trustee's June 10, 2008 email correspondence made by her counsel to Mr. Reardon.

On June 16, 2008 the Chapter 7 Trustee filed an Expedited Motion to Approve Lease of Restaurant Assets and Sale of Inventory Pending Approval of Sale of All Restaurant Assets (the "Lease and Inventory Motion"), seeking approval of the Trustee's lease of restaurant assets to Ms. Miller for $250.00 per week, and a sale of the restaurant inventory to Ms. Miller for $3,000 payable in installments. An order was entered June 17, 2008 granting the Lease and Inventory Motion. There is no evidence of service of the Lease and Inventory Motion or the order on Ms. Miller. Mr. Reardon did not approve the order. No formal lease agreement was executed. Ms. Miller never signed any document containing an offer on her part to lease the restaurant or containing any terms of the lease or inventory purchase.

5

On June 16, 2008, the Chapter 7 Trustee also filed a Motion to Approve Sale of Restaurant Assets Free and Clear of Liens (the "Sale Motion"). By the Sale Motion, the Chapter 7 Trustee requested Court approval to sell the restaurant assets to Ms. Miller. The terms and conditions of sale as described in the Sale Motion included a purchase price of $50,000, and that Ms. Miller (defined in the Sale Motion as the Purchaser) would deposit $5,000 of earnest money in escrow. The described terms and conditions for sale also included a financing contingency, described as follows:

> Trustee is informed and believes that Purchaser has or will have the financial ability to pay the purchase price at closing in accordance with the terms set forth in paragraph 3, although the Purchase Agreement is conditioned on Purchaser obtaining financing.

Sale Motion, ¶ 4.

A certificate of service set forth in the Sale Motion reflects service of the Sale Motion on Mr. Reardon. A form of order approving the Sale Motion is not attached to the Motion. No formal purchase agreement was executed for the purchase and sale of the restaurant assets. Ms. Miller never signed any document containing an offer on her part to lease the restaurant or containing any terms of the lease.

On June 24, 2008 counsel for the Chapter 7 Trustee sent email correspondence to Mr. Reardon discussing closing of the sale of the restaurant assets and asking that Mr. Reardon have his client pay the rent and inventory cost as soon as possible. *See* Exhibit H. Mr. Reardon responded to Mr. Giddens by email correspondence of that same date that "Bill transferred earnest Money +250 rent and 250 food to my trust account which I will fwd Wed." *See* Exhibit I. On July 1, 2008, counsel for the Chapter 7 Trustee sent email correspondence to Mr. Reardon advising him that the Chapter 7 Trustee still had not yet received the $5,000 earnest money or a weekly rental payment that was due, and

6

asking that Mr. Reardon "please have your client tend to this promptly." *See* Exhibit J. On July 2, 2008, Mr. Reardon responded to the Chapter 7 Trustee's counsel by stating: "I wrote Yvette a check this A.M. for $5,500. It will be mailed to you today." *Id.* On July 2, 2008, Mr. Reardon sent counsel for the Chapter 7 Trustee a letter and a check in the amount of $5,500 drawn on his trust account representing $5,000 for earnest money for the purchase of the restaurant assets and $250.00 for rent for the period June 10, 2011 to June 17, 2011, and $250.00 for food inventory. *Id.* The letter reflects that a copy was sent to William Gill. *Id.* It does not show a copy to Nancigail Miller. *Id.* The check includes the notation "For Gill." *Id.* In other e-mail correspondence by the Chapter 7 Trustee's counsel to Mr. Reardon relating to closing of the purchase and sale of restaurant assets or payment of rent under the month-to-month lease, the Chapter 7 Trustee's counsel referred to the purchaser as "your client." (*See, e.g.,* Exhibit K, email dated July 14, 2008 - "Please have your client remit the $750 for rent plus any additional inventory funds, immediately."; Exhibit L, email dated October 30, 2008 – "Please contact me to let me know when the rent will be paid, and on what date does your client plan to close."). Mr. Reardon never specifically advised the Chapter 7 Trustee or her counsel whether he represented Ms. Miller, nor did the Chapter 7 Trustee or her counsel ever ask Mr. Reardon to confirm whether he represented Ms. Miller.

On August 26, 2008, an order was entered approving the sale of the restaurant assets (the "Sale Order") authorizing the Trustee to sell the restaurant assets to Ms. Miller free and clear of liens for $50,000 cash payable at closing. Mr. Reardon did not approve the Sale Order. By email correspondence dated October 31, 2008, counsel for the Chapter 7 Trustee asked Mr. Reardon "when does she intend to close?" *See* Exhibit L.

7

Mr. Reardon responded that "According to Bill, they need about 3 weeks to closed and bring the rent current." *Id.* In Mr. Giddens' reply dated November 6, 2008, he asks Mr. Reardon to "advise them that they need to pay the rent current, and they need to give us a specific closing date." *Id.*

Ms. Miller never obtained financing and failed to close the transaction. The Trustee eventually sold the restaurant assets to another buyer for $20,000.

Mr. Reardon was Mr. Gill's attorney and took his instructions from Mr. Gill regarding the month-to-month lease and purchase agreement. Mr. Reardon never spoke with Ms. Miller. Ms. Miller never retained Mr. Reardon as her counsel or authorized him to act as her agent. The Trustee believed that Ms. Miller, not Mr. Gill, was the lessee under the month-to-month lease of the restaurant and was the buyer of the restaurant assets under the purchase and sale agreement, and that Mr. Reardon was acting on behalf of Ms. Miller as well as representing Mr. Gill as his counsel.

### B. STANDARD FOR SUMMARY JUDGMENT

It is appropriate for the Court to grant summary judgment if the pleadings, discovery materials, and any affidavits before the Court show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c) made applicable to adversary proceedings by Fed. R. Bankr.P. 7056. "[A] party seeking summary judgment always bears the initial responsibility of informing the . . . court of the basis for its motion, and . . . [must] demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Courts must review the evidentiary materials submitted in support of a motion for summary judgment to ensure that the motion is properly supported by evidence. If the evidence submitted in support of

the summary judgment motion does not meet the movant's burden, then summary judgment must be denied.

Hearsay evidence cannot be considered on a motion for summary judgment. *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994). Any documentary evidence submitted in support of summary judgment must either be properly authenticated or self authenticating under the Federal Rules of Evidence. *Goguen v. Textron, Inc.*, 234 F.R.D. 13, 16 (D. Mass. 2006). Furthermore, New Mexico Local Bankruptcy Rule 7056-1 provides that the movant's statement of material facts as to which the movant contends no genuine fact exists must "refer with particularity to those portions of the record upon which the movant relies." NM LBR 7056-1. Finally, Local Rule 7056-1(b) specifically provides that the statement of material facts, "…shall be numbered." NMLBR 7056-1(b).

### C. DISCUSSION

The Chapter 7 Trustee filed this adversary proceeding against Ms. Miller seeking to recover: 1) the difference between the $50,000 sales price approved in the Sale Order and the price she actually received upon consummation of a sale to a different party; and 2) $2,500.00 representing unpaid rent. *See* Complaint for Breach of Contract ("Complaint") - Docket No. 1. On May 6, 2010, the Chapter 7 Trustee filed the Amended Complaint joining Walter Reardon and William Gill as additional Defendants. The Chapter 7 Trustee seeks recovery against Mr. Reardon and Mr. Gill for breach of the purchase and sale agreement and for breach of the month-to-month lease. The Chapter 7 Trustee also seeks recovery from Mr. Gill on a claim to collect an account.

A. *Plaintiff's Claims Against William Gill and Walter Reardon for Breach of the Agreement for the Purchase of Restaurant Assets*

Plaintiff asserts that Mr. Gill is party to an agreement for the purchase of the restaurant assets of Texas Reds as an undisclosed or unidentified principal and is liable for breach of the

9

agreement. Plaintiff also contends that Mr. Reardon is liable for breach of the agreement as the agent for an undisclosed or unidentified principal. The alleged breach is the purchaser's failure to pay the $45,000 balance of the purchase price and close the transaction. Mr. Gill and Mr. Reardon both deny liability, asserting, among other things, that the statute of frauds bars the Plaintiff's recovery,[2] and that under the agreement the buyer's obligation to close was conditioned upon the buyer obtaining financing, which never occurred.

Plaintiff relies upon the following facts to demonstrate that a financing contingency was not part of the agreement for the sale of the restaurant assets: 1) the counteroffer made by the Trustee's counsel by email to Mr. Reardon dated June 10, 2008 did not contain a financing contingency; and 2) the Sale Order did not include a financing contingency. This Court disagrees, and finds for the following reasons that the facts not subject to genuine dispute establish that the purchaser's obligation to close was conditioned upon the purchaser obtaining financing.

First, there was no formal executed written purchase and sale agreement. There was an offer, a counteroffer by email in the form of comments on the offer, a motion to approve the sale that described the terms of the agreement, and an order approving the sale. To the extent there was a binding agreement for the sale of the restaurant assets, it was memorialized in a series of writings that must be considered together to ascertain the terms of the agreement.[3] Second, the Sale

---

[2]Because the Court finds that neither Mr. Reardon nor Mr. Gill can be held liable under the agreement due to the financing contingency, it is not necessary for the Court to consider the Defendants' statute of frauds defense.
[3]*See Aragon v. Boyd,* 80 N.M. 14, 17, 450 P.2d 614, 617 (1969)(acknowledging that a written contract "'may be made up of letters and telegrams or any other character of writing or writings, which together will constitute a contract, or it may be a formal contract.'")(quoting 1 Restatement of Law of Contracts, Sec. 209)); *Balboa Const. Co, Inc. v. Golden,* 97 N.M. 299, 304, 639 P.2d 586,591 (Ct.App. 1981)("Vitally significant is the requirement that the essential or material terms of the contract between the parties be set forth in the writings relied upon, and the terms of the purported contract must be ascertainable from the writing or by reference to another writing, and cannot be proved by parol proof.")(citations omitted). *See also Pitek v. McGuire,* 51 N.M. 364, 371, 184 P.2d 647, 651 (1947) (holding that an oral agreement for the sale of real property can satisfy the statute of frauds based on a

10

Motion, prepared by the Chapter 7 Trustee, recited that one of the terms of the agreement is that "the Purchase Agreement is conditioned on Purchaser obtaining financing." Motion, ¶ 4. The Sale Order does not purport to summarize all of the terms of the agreement, but simply provides that the Sale Motion is granted and authorizes the Chapter 7 Trustee to sell the assets in question for $50,000 payable in cash at closing. The Court finds that the financing contingency described in the Sale Motion was a term of the agreement. Ms. Miller and Mr. Gill attempted to but did not obtain financing for the purchase of the restaurant assets.[4] As a result of the failure of the closing condition, the purchaser had no obligation to close.[5] Thus the failure to close the transaction did not constitute a breach of the agreement. Because the purchaser did not breach the agreement, Mr. Gill cannot be held liable for breach of contract as an undisclosed or unidentified principal to the contract, and Mr. Reardon cannot be held liable for breach damages as an agent for an undisclosed or unidentified principal.[6]

---

subsequent or contemporaneous informal writing or writings that state each of the essential elements, identify the property to be sold and the parties to the contract, and include the signature of the party to be charged).

[4] Ms. Miller testified that she prepared the letter of intent dated May 24, 2008 and "faxed it to her father." *See* Deposition of Nancigail Miller, p.10 (Exhibit S). She further testified that if she had any discussions with her father it was to tell him that she couldn't get any funds. *Id.* at p.15 Mr. Gill testified that he also attempted to obtain financing but was unable to borrow from a bank because of his credit. *See* Deposition of William Gill ("Gill Deposition"), p 29 (Exhibit B). He further testified that he attempted to get financing from individuals, but that those attempts were equally unsuccessful. *Id.*

[5] *See Elephant Butte Resort Marina, Inc. v. Wooldridge,* 102 N.M. 286, 289-290, 694 P.2d 1351, 1354-1355 (1985)(recognizing "that a contracting party may repudiate his performance of the contract if the satisfaction of a condition precedent as to financing is not met.")(citing *Enerdyne Corp. v. Wm. Lyon Dev. Co.,* 488 F.2d 1237 (10th Cir. 1973)).

[6] *Cf.* Restatement (Third) of Agency § 6.03 (2006) (providing that "[w]hen an agent acting with actual authority makes a contract on behalf of an undisclosed principal . . . . (2) the agent and the third party are parties to the contract; and (3) the principal, if a party to the contract, and the third party have the same rights, liabilities, and defenses against each other as if the principal had made the contract personally . . ."); Restatement (Third) of Agency § 6.02 (2006)(providing that "[w]hen an agent acting with actual or apparent authority makes a contract on behalf of an unidentified principal, . . . (2) the agent is a party to the contract . . .").

11

B. *Plaintiff's Claims Against William Gill and Walter Reardon for Breach of the Month-to-Month Lease*

  a. *Defendant William Gill Admits Liability for the Shortfall in Rental Payments*

Plaintiff seeks summary judgment against Mr. Gill for breach of the lease agreement as unidentified principal. The agreement was entered into for lease of the restaurant assets in the amount of $250.00 per week and the purchase of inventory. Plaintiff contends that when the agreement was terminated on January 9, 2009 because the restaurant was sold to a different buyer, Mr. Gill owed Plaintiff $2,500.00 for unpaid rent. Mr. Gill's Response to the Plaintiff's Motion for Summary Judgment concedes that he owes the outstanding rent due under the lease agreement. *See* Defendant William Gill's Response to Plaintiff's Motion for Summary Judgment, p. 2 ("Mr. Gill admits his liability for the shortfall in payments on this lease of $2,500."). The Court will, therefore, grant Plaintiff's Motion for Summary Judgment on the claim for breach of the lease agreement as to Mr. Gill.

  b. *Whether Walter Reardon is Liable for the Breach of the Lease Agreement Under Agency Principles*

Plaintiff seeks summary judgment against Mr. Reardon for breach of the lease agreement under the common law of agency. In support, Plaintiff asserts that Mr. Reardon negotiated the lease agreement and knew that Mr. Gill was the true principal. Plaintiff's agency argument attempts to impose liability on Mr. Reardon as agent for an undisclosed principal, Mr. Gill. New Mexico law recognizes that an agent who negotiates a contract on behalf of an undisclosed principal can become a party to the contract.[7]

---

[7] *See, e.g., Otero v. Wheeler,* 102 N.M. 770, 701 P.2d 369 (1985)(recognizing "that when an agent signs his own name and fails to disclose the fact that he is acting for a principal, the agent alone is bound by the contract.")(citations omitted); *Farmers Alliance Mut. Ins. Co. v. Naylor,* 452 F.Supp.2d 1167, 11 (D.N.M. 2006)("Under the law of agency, an agent who enters a contract 'for an undisclosed or a partially disclosed principal will be liable as a party to the contract.'")(quoting *Saliba v. Dunning,* 682 A.2d 224, 226 (Me. 1996)(citing Restatement (Second) of Agency §§ 321, 322 (1958)).

12

The facts establish the following: 1) by letter dated June 5, 2008 from Mr. Reardon to Yvette Gonzales, Mr. Reardon proposed a 30-day lease to Nancigail Miller pending the sale of the restaurant assets; 2) by email correspondence from Mr. Reardon to counsel for the Chapter 7 Trustee, Mr. Reardon proposes that Ms. Miller operate the restaurant under a week-to-week lease for $250 per week until the Chapter 7 Trustee either rejected the purchase offer or closed a sale of the restaurant assets to Ms. Miller; 3) Mr. Reardon never specifically advised the Chapter 7 Trustee or her counsel whether he represented Ms. Miller; and 4) Ms. Miller did not retain Mr. Reardon as her counsel or authorize him to act as her agent. The Affidavit of Yvette J. Gonzales, Chapter 7 Trustee ("Gonzales Affidavit"), offered in support of the Plaintiff's Motion for Summary Judgment states that "Mr. Reardon never indicated to me that the offer was not coming from Ms. Miller, nor that Ms. Miller was not his client or that he had no authority to be using her name in any negotiations of a lease or purchase offer." *See* Gonzales Affidavit, ¶ 7.

Because the negotiations for the sale of inventory and the interim lease occurred in New Mexico, whether Mr. Reardon can be held liable under agency principles is governed by New Mexico law. New Mexico courts consistently rely on the Restatement of Agency when applying the law of agency.[8] This Court, likewise, will turn to the Restatement for guidance. Under agency principles, "[a] person who purports to make a contract . . . with a third party on behalf of another person, lacking the power to bind that person, gives an implied warranty of authority to the third party . . ." Restatement (Third) of Agency § 6.10 (2006). An agent who implies that he has authority to act on behalf of his principal when, in fact, he has no actual authority to do so, subjects himself to liability to the third party for loss measured by the benefit expected by

---

[8] *See, e.g., Otero v. Wheeler,* 102 N.M. 770, 701 P.2d 369 (1985) (citing Restatement (Second) Agency to construe liability of undisclosed principal or partially disclosed principal under New Mexico law); *Morris Oil Co., Inc. v. Rainbow Oilfield Trucking, Inc.,* 106 N.M. 237, 239, 741 P.2d 840, 843 (Ct. App. 1987)(citing Restatement (Second) of Agency § 194 (1958) for the well established rule of law "that an agent for an undisclosed principal subjects the principal to liability for acts done on his account if they are usual or necessary in such transactions.").

13

performance by the principal, unless the agent expressly notifies the third party that he is not giving a warranty of his authority, the principal ratifies the contract, or the third party knows that the agent has acted without actual authority.[9]

"Whether a person makes an implied representation of authority is a question of fact to be determined by inferences to be drawn from the person's conduct." Restatement (Third) of Agency § 6.10 (2006), Comment c. Here, the facts establish that Mr. Reardon proposed the week-to-week lease on behalf of Ms. Miller even though Ms. Miller had not retained him as counsel or authorized him to act as her agent, and Mr. Reardon did not inform the Chapter 7 Trustee that he lacked authority to negotiate the transaction on Ms. Miller's behalf. Further, the

---

[9] The Agent's Implied Warranty of Authority as stated in the Restatement provides:

A person who purports to make a contract, representation, or conveyance to or with a third party on behalf of another person, lacking power to bind that person, gives an implied warranty of authority to the third party and is subject to liability to the third party for damages for loss caused by breach of that warranty, including loss of the benefit expected from performance by the principal, unless
  (1) the principal or purported principal ratifies the act as stated in § 4.01; or
  (2) the person who purports to make the contract, representation, or conveyance gives notice to the third party that no warranty of authority is given; or
  (3) the third party knows that the person who purports to make the contract, representation, or conveyance acts without actual authority.

Restatement (Third) of Agency § 6.10 (2006).

*See also, DePetris & Bachrach, LLP v. Srour,* 71 A.D.3d 460, 462, 898 N.Y.S.2d 4, 6 (N.Y.App. Div. 2010)("Under the doctrine of implied warranty of authority, a person who purports to make a contract, representation, or conveyance to or with a third party on behalf of another person, lacking power to bind that person, gives an implied warranty of authority to the third party and is subject to liability to the third party for damages for loss caused by breach of that warranty, including loss of the benefit expected from performance by the principal.")(citing Restatement (Third) of Agency §6.10 [2006]); *Hart v. Bridges,* 30 Ark.App. 262, 268, 786 S.W.2d 589, 592 (Ark.App. 1990)(acknowledging that "generally, an agent who contracts in the name of his principal without authority, so that the principal is not bound, may be personally liable to the other contracting party.")(citation omitted); *Oliver v. Morawetz,* 97 Wis. 332, 334, 72 N.W. 877, 879 (1897)("'This whole doctrine proceeds upon a plain principle of justice; for every person so acting for another, by a natural, if not a necessary, implication, holds himself out as having competent authority to do the act; and he thereby draws the other party into a reciprocal engagement. If he has no such authority, and acts *bona fide,* still he does a wrong to the other party; and, if that wrong produces injury to the latter, owing to his confidence in the truth of an express or implied assertion of authority by the agent, it is perfectly just that he who makes such assertion should be personally responsible for the consequences, rather than that the injury should be borne by the other party who has been misled by it.'")(quoting *Kroeger v. Pitcairn,* 14 Lanc.B. 133, 12 W.N.C. 375, 101 Pa. St. 311 (1882)).

In imposing liability on the agent under these circumstances, the agent is not made a party to the contract; rather, liability is premised on a breach of "'an implied promise on the part of the agent that he has the authority to make the contract.'" *Hart v. Bridges,* 786 S.W.2d at 271 (quoting *Clements v. Citizens' Bank of Booneville,* 177 Ark. 1085, 1088-90, 9 S.W.2d 569, 570-71 (Ark. 1928)).

14

Chapter 7 Trustee had no reason to question Mr. Reardon's authority to negotiate on behalf of Ms. Miller or to bind her to a contract.[10] By proposing the terms of the lease to the Chapter 7 Trustee purportedly on behalf of Ms. Miller, Mr. Reardon was more than a mere conduit, as he asserts, for communicating between Ms. Miller and the Chapter 7 Trustee. Mr. Reardon falls within the category of agents who "'with knowledge of [their] want of authority, but without intending any fraud, . . . assume[d] to act as though [they] were fully authorized.'" *Oliver v. Morawetz,* 97 Wis. 332, 334, 72 N.W. 877, 879 (Wis. 1897)(quoting *Kroeger v. Pitcairn,* 14 Lanc.B. 133, 12 W.N.C. 375, 101 Pa. St. 311 (1882)). This is sufficient under the facts before the Court to establish Mr. Reardon's liability, measured by the unpaid rent the Chapter 7 Trustee expected to receive under the contract.[11] The Court will, therefore, grant the Plaintiff's motion for summary judgment on her claim against Mr. Reardon to recover the unpaid rent due under the week-to-week lease of the restaurant.

C. *Plaintiff's Claim Against William Gill based on Amount Due from Insiders Reflected in Monthly Operating Report*

Plaintiff seeks summary judgment against Mr. Gill for the $98,519.15 listed on the September 2005 MOR and identified as "Due From Insiders." Monthly operating reports are signed under oath. Mr. Gill signed all of the monthly operating reports filed on behalf of the Debtor in the Texas Reds Bankruptcy Case as a principal of Texas Reds. Plaintiff relies on the

---

[10] The references to Mr. Gill in the correspondence from Mr. Reardon to the Chapter 7 Trustee and her counsel are insufficient to put the Chapter 7 Trustee on notice that Mr. Reardon only represented Mr. Gill, or that she should inquire further about whether Mr. Reardon had authority to act as Ms. Miller's agent. The Chapter 7 Trustee knew that Mr. Reardon represented Mr. Gill and that Ms. Miller was Mr. Gill's daughter. Given the close family relationship between Mr. Gill and Ms. Miller, their apparent shared concern that the restaurant continue to operate pending the sale, Mr. Gill's hands on operation of the business, and Mr. Reardon's representation of Mr. gill as his counsel, nothing in the correspondence from Mr. Reardon would cause the Chapter 7 Trustee to make further inquiry about Mr. Reardon's actual authority to bind Ms. Miller.

[11] Mr. Gill has acknowledged his liability for the $2,500 balance due under the terms of the week-to-week lease. An agent's liability to the third party is relieved if the third party recovers from the other party. *See* Restatement (Third) of Agency § 6.09 (When an agent has made a contract with a third party on behalf of a principal, unless the contract provides otherwise, . . . (2) the liability, if any, of the principal or the agent to the third party is discharged to the extent a judgment against the other is satisfied.").

15

September 2005 MOR, signed by Mr. Gill under penalty of perjury, and the deposition testimony of Robert Mantz, the accountant for Texas Reds who prepared the monthly operating reports to support her motion for summary judgment.

Mr. Mantz testified in his deposition that it was his understanding that Mr. Gill reviewed all of the monthly operating reports before signing them.[12] Mr. Mantz further testified that he knew this "Just by conversation with him [Mr. Gill] on the telephone," and that Mr. Gill "would always go through them, and then if he had any questions he would ask me on the telephone."[13] Mr. Mantz also testified that the amount due from Mr. Gill increased to $98,519.15 from the amount reported on the October 2004 MOR.[14] There is no testimony from Mr. Mantz concerning any conversation with Mr. Gill specifically discussing the Due from Insiders line item on the monthly operating reports. Rather, Mr. Mantz's deposition testimony confirms that generally he would discuss the contents of the monthly operating reports with Mr. Gill.[15]

To rebut the Plaintiff's claim, Mr. Gill asserts that the account was not a personal debt, but that the Debtor used its funds to pay expenses of Red Eagle Golf Course, Inc., owned 80% by the Debtor,[16] and that the debt arising from those payments and from restaurant expenses was misclassified as a debt owed by Mr. Gill. Mr. Gill testified in his deposition that he did not receive a personal loan from the Debtor, that the money reflected in the September 2005 MOR was used for the golf course or for restaurant expenses, and that he "probably didn't document it correctly so Robert Mantz probably put it under my name personally."[17]

---

[12]*See* Deposition of Robert Mantz ("Mantz Deposition"), p. 19, line 9 (Exhibit T)("My understanding was he [Mr. Gill] reviewed all of them.").
[13]Mantz Deposition, p. 19, lines 11, 18-20.
[14]Mantz Deposition, pp. 25-26.
[15]Mantz Deposition, pp. 19 – 20, lines 23-25 and line 1.
[16] The Debtor's Schedule B lists an "[a]pproximately 80% interest in Red Eagle Golf Course, Inc." *See* Case No. 7-04-15995, Docket No. 8.
[17]Gill Deposition, pp. 47-48 (Exhibit B). Mr. Gill's Deposition testimony is as follows:
    Q. When you owned Texas Reds, did you take any personal loans from the company?

16

Monthly operating reports filed in a Chapter 11 bankruptcy case and signed under penalty of perjury are in the nature of admissions.[18] The significant debt that the Plaintiff seeks to collect from Mr. Gill is identified on one line of a 13-page monthly operating report. There is no indication that Mr. Mantz, who prepared the monthly operating reports on behalf of the Debtor, actually discussed that entry with Mr. Gill. Mr. Gill's deposition testimony raises genuine issues of material fact as to the nature of the debt owing to the Debtor reflected in the September 2005 MOR as "Due from Insiders." The Court will, therefore, deny summary judgment on the Plaintiff's claim against Mr. Gill for the account in the amount of $98,519.15.

## CONCLUSION

Based on the foregoing, the Court concludes that summary judgment should be granted in favor of Mr. Reardon on Plaintiff's claim for beach of the agreement for sale of restaurant assets. The agreement had a financing contingency that was never satisfied. Plaintiff, therefore, cannot enforce the agreement against Mr. Gill or Mr. Reardon. Plaintiff is entitled to summary judgment on her claim to recover $2,500 from Mr. Gill and Mr. Reardon attributable to the

---

        A. I don't think so.
        Q. Do you recall the company making a loan to you for $98,000?
        A. No.
        Q. I'm going to hand you this sheet. This is a sheet from Robert Mantz, CPA. I believe it was an accounting that was earlier produced in the deposition of your other daughter. It says, "Due from insiders, $98,000," by you. Do you know why that would be recorded that way if you didn't take any loans from Texas Reds?
        A. No. Probably money over an extended period of time for paying suppliers and vendors, cash money. I didn't document it correctly so Robert Mantz probably put it under my name personally. I never took money like that as an advance or for my own personal use. I used a lot for the golf course expenses previously and for restaurant expenses.
        Q. The 98,000 would have been some money that you used at the golf course?
        A. Probably most of it.
        Q. Because you are saying Texas Reds, Inc. owned part of the golf course?
        A. Right.
        Q. Do you know how much of that $98,000 might have gone toward the golf course?
        A. I don't know how much would have gone to the golf course and how much would have gone to Texas Reds expenses, cash only for deliveries and what have you.

    Gill Deposition, p. 47, lines 11 – 25 and page 48, lines 1 – 18.

[18] *See In re Harmony Holdings, LLC,* 393 B.R. 409, 414 (Bankr.D.S.C. 2008)(taking judicial notice of the monthly operating reports as admissions of the debtors).

week-to-week lease of the restaurant pending the sale of the restaurant assets.  Finally, genuine issues of material fact preclude summary judgment on Plaintiff's claim to recover $98,519.15 from Mr. Gill premised on the September 2005 MOR.   Appropriate orders consistent with this Memorandum Opinion will be entered.

_____
ROBERT H. JACOBVITZ
United States Bankruptcy Court

Entered on Docket Date:   September 29, 2011

Copies:

George D Giddens, Jr
Ann H. Washburn
Law Office of George Dave Giddens, PC
10400 Academy Rd NE Ste 350
Albuquerque, NM 87111-1229
*Attorneys for Yvette J. Gonzales, Trustee*

Walter L Reardon, Jr.
3733 Eubank Blvd NE
Albuquerque, NM 87111-3536

Paul David Mannick
Paul D Mannick Firm
1210 Luisa St #5
Santa Fe, NM 87505
*Attorney for William Gill*